## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NORTH CAROLINA
## EASTERN DIVISION
## CASE NO.: 4:24-cv-173

| | | |
|---|---|---|
| Rebecca Droberg and Michael Droberg, individually and on behalf of their minor child, S.D., <br><br> PLAINTIFFS, <br><br> v. <br><br> Carteret County Board of Education, <br><br> DEFENDANT. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **COMPLAINT** |

## PRELIMINARY STATEMENT

1. Rebecca Droberg and Michael Droberg, individually and on behalf of their minor child, S.D., file this complaint against Defendant for declaratory judgment, injunctive relief, equitable relief, and compensatory damages due to Defendant's failure to comply with the terms of the August 28, 2023, Settlement Agreement resolving their IDEA due process complaint, which was reached by the parties through North Carolina's mediation process; and Defendant's retaliation and discriminatory conduct against Plaintiffs based on S.D.'s disability in an education program receiving federal funds, in violation of Section 504 of the Rehabilitation Act ("Section 504"), Title II of the Americans with Disabilities Act (ADA).

1

## JURISDICTION AND VENUE

2.    This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367 and 20 U.S.C. § 1415.

3.    Exhaustion is unnecessary in federal claims where the Plaintiff seeks a remedy that is not available under the Individuals with Disabilities Education Improvement Act ("IDEA"). "Administrative exhaustion requirement applies only to suits that "see[k] relief . . . also available under" IDEA." *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 147 (2023) citing 20 USC §1415(l). Plaintiff has exhausted all administrative remedies pursuant to 20 U.S.C. § 1415(l) as it pertains to the claims in this Complaint.

4.    This Court has the authority to enter a declaratory judgment and to provide temporary and permanent injunctive relief pursuant to Rules 57 and 65 of the Federal Rules of Civil Procedure, 28 U.S.C. §§ 2201 and 2202 and 20 U.S.C. § 1682-85.

5.    Venue in the Eastern District of North Carolina is proper under 28 U.S.C. § 1391 because Defendant is a public school district located within the Eastern District of North Carolina, and a substantial part of the acts or omissions giving rise to this Complaint arose from events occurring within this judicial district.

## PARTIES TO THE COMPLAINT

6.    Plaintiff S.D. is a ten (10) year old student, and his date of birth is March 25, 2014. S.D. currently resides with his mother, Plaintiff Rebecca Droberg (R.D.)

and his father, Plaintiff Michael Droberg (M.D.) at 174 White Oak Bluff Road, Stella, NC 28582. At all relevant times hereto were residents of, the County of Carteret, State of North Carolina.

7.     S.D. is a qualified individual/child with a disability within the meaning of Title II of the ADA, Section 504, IDEA, and North Carolina law.

8.     Carteret County Board of Education also known as Carteret County Public Schools ("CCPS" or "Defendant Board" or "Defendant") is a local educational agency as defined by the IDEA, 20 U.S.C. § 1401; *see* N.C. Gen. Stat. §115C-5(7a).

9.     Defendant Board is a public governmental entity subject to the provisions of Title II of the ADA, 42 U.S.C. §§ 12131, *et seq.*, and the United States Department of Justice regulations implementing Title II, 28 C.F.R. Part 35.

10.    Defendant Board is, and at all times relevant to this action was, a body politic and local board of education, as that term is defined in North Carolina General Statute § 115C, with the responsibility of providing school children, including S.D., full and equal access to the public educational programs and activities offered in Carteret County in accordance with state law and the North Carolina Constitution. As a local governmental unit, Defendant Board is a recipient of federal funds within the meaning of 20 U.S.C. § 1681.

## FACTUAL ALLEGATIONS

11.    S.D. is a child with a disability as defined in 20 U.S.C. § 1401(3) and N.C. Gen. Stat. §115C-106.3(1).

3

12. Likewise, S.D. is a "handicapped person" as defined by the regulations of Section 504 of the Rehabilitation Act ("Section 504") and is otherwise qualified to attend school in Defendant Board's school district and access the general education program alongside his non-disabled peers. 34 C.F.R. § 104.3(j)(1).

13. Additionally, S.D. is a "qualified individual with a disability," as defined by the Americans with Disabilities Act, 42 U.S.C. § 12131(2).

14. S.D. has been diagnosed with Down syndrome, autism spectrum disorder, Type-1 diabetes, mild conductive hearing loss, obstructive sleep apnea, and Hashimoto's hypothyroidism.

15. Defendant developed S.D.'s first Individualized Education Program ("IEP") in March 2017 as a preschool student in the category of Developmental Delay ("DD"). In February 2022, Defendant changed his primary eligibility category to Autism ("AU") and secondary category to Other Health Impaired ("OHI") due to his diagnosis of Down syndrome.

16. Throughout S.D.'s enrollment in Defendant's schools, S.D.'s parents have advocated for S.D.'s inclusion with his nondisabled peers in accordance with all evidence-based research and the least restrictive environment mandate of the IDEA, and Defendant has sought to segregate and repeatedly segregated S.D. from his nondisabled peers.

17. S.D. has always been educated on the standard course of study in North Carolina leading to a high school diploma.

18.     Prior to the August 28, 2023, Settlement Agreement ("Settlement Agreement"), without Plaintiffs' knowledge or consent, Defendant did not follow the service delivery in S.D.'s IEP and segregated him from his nondisabled peers for more time than his IEP indicated.

19.     Prior to the Settlement Agreement, Defendant did not provide S.D. either a permanent exceptional children (EC) teacher or a consistent assigned aide. Plaintiff R.D. repeatedly raised her concerns in IEP meetings about the inconsistency in Defendant's instructional support for S.D. Defendant acknowledged the impact of the lack of consistency on S.D.'s ability to access and progress in the general education setting and chose not to assign S.D. permanent EC teachers or staff and reassigned his aides to support other children.

20.     Prior to the Settlement Agreement, the IEP team did not develop a Behavior Intervention Plan (BIP) to ensure all staff interacted consistently with S.D. when addressing his behavior. When Defendant finally developed a BIP in February 2024, it did not train school personnel on the BIP.

21.     Prior to the Settlement Agreement, Defendant never provided a Registered Behavior Technician (RBT) to support S.D. during the school day with his disability-related behaviors (e.g., transition and task refusal, blowing raspberries).

22.     In January 2023, Defendant assigned S.D. another new special education teacher, Ms. Kelly Forbis. On the second day Ms. Forbis worked with S.D., Ms.

Forbis performed an avoidable, escalated, and unauthorized Crisis Prevention Institute (CPI) restraint on S.D. while in the staff bathroom to forcibly clean his private areas.

23. The incident report documents aversive procedures were used on S.D. during the restraint. S.D.'s principal, Dr. Howard, signed the incident report verifying its accuracy.[1] [2]

24. As a result of the restraint and the subsequent fear of Ms. Forbis, S.D. exhibited behavioral issues in Ms. Forbis's presence that severely impeded his

---

[1]North Carolina General Statute Section 115C-391.1(b)(2) defines an "aversive procedure" as a "systematic physical or sensory intervention program for modifying the behavior of a student with a disability which causes or reasonably may be expected to cause one or more of the following:

    a.    Significant physical harm, such as tissue damage, physical illness, or death.

    b.    Serious, foreseeable long-term psychological impairment.

    c.    Obvious repulsion on the part of observers who cannot reconcile extreme procedures with acceptable, standard practice, for example: electric shock applied to the body; extremely loud auditory stimuli; forcible introduction of foul substances to the mouth, eyes, ears, nose, or skin; placement in a tub of cold water or shower; slapping, pinching, hitting, or pulling hair; blindfolding or other forms of visual blocking; unreasonable withholding of meals; eating one's own vomit; or denial of reasonable access to toileting facilities."

[2] The use of aversive procedures in public schools is strictly prohibited by law. N.C. Gen. Stat. §115C-391.1(h). It is also strictly prohibited by Defendant's own policy manual regarding seclusion and restraint. CCPS Policy 4302-R.

ability to access his education. Plaintiff R.D. requested Defendant assign S.D. a different special education teacher.

25. Although other special education teachers were available, Defendant refused to assign anyone but Ms. Forbis to work with S.D.

26. Due to Plaintiffs' concerns regarding S.D.'s safety with Ms. Forbis and Defendant's unwillingness to allow anyone else to provide S.D. specially designed instruction, S.D. did not attend school for the remainder of the 2022-2023 school year.

### *2023 Due Process Petition (23-EDC-00557)*

27. On February 6, 2023, S.D.'s mother, R.D filed a *pro se* due process petition against CCPS (23-EDC-00557), which she Amended on March 15, 2023. M.D. was not a party to the 2023 due process petition.

28. The Parties participated in two (2) mediations with mediators assigned by the North Carolina Department of Public Instruction ("DPI"), which were not successful.

29. On June 20, 2023, S.D.'s mother, R.D., filed a Second Amended Petition thus resetting the resolution period.

30. On June 26, 2023, the Parties submitted a Due Process Resolution Meeting form to DPI noting their agreement to waive a resolution meeting and, again, participate in mediation.

31. On June 28, 2023, the Parties submitted a Joint Request for Settlement Conference with an administrative law judge (ALJ), as contemplated by North

Carolina General Statute Section 115C-109.4(i), indicating "[t]he Parties desire the opportunity to jointly discuss potential avenues for resolution in this matter."

32. On July 7, 2023, the Parties submitted a Joint Motion to Continue "the hearing and all pre-hearing deadlines in this matter" noting the Parties' agreement "that additional time to work towards resolution in this matter would be appropriate."

33. On August 21, 2023, the Parties submitted a second Joint Motion to Continue explaining "[t]he Parties are continuing to work towards settlement in this matter, and the mediated settlement conference is not yet at impasse." At no point did the Parties indicate the mediation was at an impasse thereby closing the resolution session. 34 C.F.R. § 300.510(c)

### *August 28, 2023, Settlement Agreement*

34. On August 28, 2023, the Parties entered into the Settlement Agreement to resolve the claims related to Defendant's denials of FAPE prior to August 28, 2023, attached hereto as Exhibit 1 and incorporated herein by reference. By entering into the Settlement Agreement, Defendant represented to Plaintiffs it would comply with the terms during the relevant time periods. Based on this representation, Plaintiffs released the claims in the prior due process petition, 23-EDC-00557, some of which are summarized *supra*.

35. As the prior denial of FAPE related to *inter alia* Defendant's failure to include S.D. with his non-disabled peers, provide appropriate behavioral supports, and

the aversive restraint of S.D. by an employee without current CPI licensure, the Settlement Agreement included specific provisions designed to support transparency in communication, independence of outside providers, and appropriate training and support for the school staff working with S.D.

36. When S.D. returned to school on September 5, 2023, it was the first time S.D. had been in school since January 20, 2023, after missing approximately ninety (90) school days, not including Extended School Year (ESY) services, which Defendant did not provide during the summer of 2023.

37. S.D. started school on a modified day in accordance with the Settlement Agreement. A Transition Team met regularly during September, October, and November 2023 to increase S.D.'s time at school each day. S.D. began attending full school days on November 27, 2023.

***Defendant's Failure to Comply with the Settlement Provisions Regarding the Inclusion Consultant***

38. The Settlement Agreement provided for an Inclusion Consultant to work with S.D. and support his teachers. Ex. 1 ¶ 4(a). The very first responsibility listed in the Settlement Agreement was to "[o]bserve S.D. in the school setting" at least three (3) times each school year. Ex. 1 ¶ 4(d)(i).

39. The Inclusion Consultant, Sara Jo Soldovieri, never observed S.D. the entire year; therefore, she was unable to provide the support to S.D.'s teachers contemplated in the Settlement Agreement.

40. Defendant's contract with Ms. Soldovieri, produced in discovery, did not contemplate Ms. Soldovieri conducting any observations. According to Ms.

9

Soldovieri, Defendant never informed her of the terms of the Settlement Agreement such that she was unaware of the expectation to conduct observations or meet with Plaintiffs to discuss S.D.'s programming each month.

41. Defendant interfered with the right of the Plaintiffs to receive the benefits of the Settlement Agreement by failing to contract with the Inclusion Consultant to perform the agreed upon items, by way of example and not limitation, conducting the observations of S.D.

42. Defendant unilaterally determined the utilization of the allocated funds in the Settlement Agreement for Ms. Soldovieri to attend the IEP and transition meetings for S.D. and complete the training included in the Settlement Agreement. Ex. 1 ¶¶ 4(d)(iii), (vi). Defendant seeks to excuse compliance with the material component of observing S.D. because the funds were exhausted due to the numerous IEP meetings; however, Ms. Soldovieri could have attended the IEP meetings at Plaintiffs' expense or through her separate contract with Down Syndrome Network of Onslow and Carteret County (DSNOCC). Instead, Defendant subverted the purpose of the Settlement Agreement through its unilateral decision to not even contract with her to observe S.D.

43. At Defendant's request, Ms. Soldovieri reduced her rates in half for her services during the school year. Still, Defendant ignored its obligation to have Ms. Soldovieri observe S.D.

44. The Settlement Agreement provided for the Inclusion Consultant to meet all general education and special education teachers to whom S.D. may be assigned and make recommendations to the principal regarding who may be the best fit to teach S.D. during the 2023-24 school year. Ex. 1 ¶ 3(c). This meeting never took place. Defendant randomly assigned S.D. to Ms. Danielle Canady who, upon information and belief, never taught a child with Down syndrome previously. Ms. Canady had no understanding of S.D.'s needs or how to modify his work, and, based on her documentation described *infra*, had no desire to teach S.D. nor a commitment to his success in her classroom.

45. The Parties agreed any notes provided by the Inclusion Consultant "regarding the provision of S.D.'s educational programming by school personnel" would be provided to Plaintiffs. Ex. 1 ¶ 4(d)(v). Yet even the sparse communication with school personnel was only provided in discovery after Plaintiffs filed a second due process petition challenging Defendant's renewed segregation of S.D. This purposefully prevented Plaintiffs from monitoring whether the feedback and suggestions from the Inclusion Consultant were implemented with fidelity or at all. Furthermore, it prevented Plaintiffs from knowing Defendant had not provided for Ms. Soldovieri observe S.D. the entire year.

46. As outlined *infra,* Defendant ignored Ms. Soldovieri's input at IEP meetings when Dr. Anita Boyd, Defendant's Director of Exceptional Children, proposed segregating S.D. from his nondisabled peers and changing his curriculum to a non-diploma track over Plaintiffs' objections.

11

***Defendant's Failure to Comply with the Settlement Provisions Regarding the Independent Board-Certified Behavior Analyst (BCBA) and Registered Behavior Technician (RBT)***

47.     The Settlement Agreement provided for Defendant to contract with an "independent mutually agreeable" BCBA and RBT to provide the behavior services. Ex. 1 ¶ 1.  To ensure the independence of the BCBA, Defendant agreed the RBT would provide Plaintiffs a copy of the raw data collected weekly on S.D.'s behavior, Ex. 1 ¶ 1(b)(vii), and Defendant would "not attempt to limit the RBT or the BCBA from communicating with R.D. and/or M.D. or from communicating their concerns related to S.D.'s educational programming," Ex. 1 ¶ 1(e).

48.     Yet without Plaintiffs' knowledge or consent, Defendant surreptitiously included in its "Individual Contract" for S.D., which was incorporated with Defendant's Memorandum of Understanding with ENC ABA ("MOU"), for both the 2023-2024 and 2024-2025 school years, the following specific disclaimer for the "independent" BCBA and RBT:

> *ENC ABA staff will be hired as **CCPS representatives** and will maintain a contracted relationship with CCPS. During the term of this agreement, ENC ABA staff will refrain from acting as a parent advocate for **this client** during IEP meetings and other school related meetings. (Emphasis added.)*

49.     This clause directly violates the spirit and plain language of Paragraph 1 in

the Settlement Agreement, and Plaintiffs were unaware of the contract language until Defendant produced the contract in discovery in the 2024 Due Process action outlined *infra*.

50. The chilling effect of this contractual provision is obvious and further exemplary of Defendant's attempt to diminish the "independence" of the BCBA and RBT agreed to by the Parties in the Settlement Agreement.

51. The Parties mutually agreed to an "independent BCBA," yet Defendant then contractually removed the independence of the BCBA to control the BCBA and her collection of behavior data to further its ultimate goal of segregating S.D. from his non-disabled peers.

52. Defendant never provided the RBT's weekly raw data to Plaintiffs. The MOU does not direct the BCBA to provide Plaintiffs with the raw data. Instead, the BCBA, Ms. Jessica Harrison, created summaries of the data, which, upon information and belief based on information provided in discovery, were first reviewed and possibly edited by Dr. Boyd.

53. The 2023-2024 MOU also includes additional provisions that provide for Defendant to control and manipulate the information provided to Plaintiffs that Defendant would utilize as a basis for future decisions by S.D.'s IEP team.

54. By way of example and not limitation, the 2023-2024 MOU provides the BCBA will conduct a "[c]lassroom observation with written recommendations to the Director of Exceptional Children [i.e., Dr. Boyd] or designee."

55. During the 2024-25 school year, Dr. Boyd instructed Ms. Harrison to only

provide *summaries* of the data. Ms. Harrison stopped providing weekly summaries to R.D. In November 2024, after almost six (6) weeks of not receiving any data, R.D. contacted Ms. Harrison who responded the data summary was pending "final review" and would be sent out by the end of the following day. Upon information and belief, the "final review" was conducted by or with the participation of Dr. Boyd.

56. The Settlement Agreement provides the BCBA will train all of Defendant's staff who work with S.D. to implement S.D.'s behavioral goals. Ex. 1 ¶ 1(a)(iv). Defendant never required the BCBA to conduct such a training.

### Defendant's Failure to Comply with the Settlement Provisions Regarding the Functional Behavior Assessment (FBA) and Behavior Intervention Plan (BIP)

57. As part of the Settlement Agreement, the Parties agreed to adopt the August 29, 2023, independent Functional Behavior Assessment (FBA) conducted by Jennifer Holmes, M.Ed., BCBA. The Parties agreed this FBA satisfied the independent FBA ordered by the OAH in the prior matter (23-EDC-00557).

58. The Parties agreed Ms. Holmes's FBA would be used to identify the target behaviors to be addressed through S.D.'s BIP that was to be developed at the August 30, 2023, IEP meeting.

59. Ms. Holmes recommended keeping S.D.'s existing behavior and social skills goals and adding two (2) additional goals to his IEP. She also provided seventeen (17) recommended antecedent strategies, seven (7) reactive

strategies, and a detailed crisis plan in light of S.D.'s prior restraint by Ms. Forbis.

60. Defendant's first mention of a BIP was February 26, 2024, almost six (6) months after the IEP when it was supposed to be created, when Defendant was proposing to segregate S.D. from his nondisabled peers. As the BCBA never developed the BIP contemplated in the Settlement Agreement, there was no plan for all staff to use in response to S.D.'s behaviors. Even after the BIP was developed at the end of February 2024, Defendant never had the BCBA provide any training to staff on implementing the BIP.

61. Contrary to the Settlement Agreement, the BCBA never conducted a second FBA during the 2023-24 school year. Therefore, the BCBA never identified the function of S.D.'s behaviors resulting in the improper reinforcement of the behaviors, upon which Defendant relied in furtherance of its goal to segregate S.D. from his nondisabled peers.

62. The Individual Contract for S.D. provides the BCBA will conduct "a full battery of assessments to develop a treatment plan and BIP with goals for the student," during the first two weeks of services, and provide "[a] copy of the assessment data, treatment plan, and goals" to the parent and the school personnel designated by Dr. Boyd. If any such assessments were completed, no data were provided to Plaintiffs, and no FBA was conducted nor was a BIP developed based on the FBA as required by the Settlement Agreement. Ex. 1 ¶¶ 5(b), 6(a), 6(c), 7(c).

63. While the 2023-24 MOU provides the BCBA will conduct an FBA and develop a BIP based on its results, Defendant did not require the BCBA to perform either during the 2023-24 school year in yet another instance of Defendant's failure to comply with the Settlement Agreement.

***Defendant's Failure to Comply with the Settlement Provisions Regarding Crisis Prevention Institute (CPI) Training***

64. Due to Defendant's unauthorized and improper prior restraint of S.D., the Settlement Agreement included a provision for "[A]ll staff assigned to work directly with S.D. and all administrators at Bogue Sound Elementary will be trained and certified in CPI prior to the first day of school of the 2023-24 school year." Ex. 1, ¶ 1(g).

65. Defendant did not train all staff as required by the agreement. Specifically, the RBT, BCBA, and all of S.D.'s Encore teachers (e.g., music, art, physical education) were not trained.

66. Importantly, while CPI training does include the use of safe restraints, the vast majority of the training teaches de-escalation techniques to avoid the need for any physical intervention.

67. The failure to train these employees, particularly the RBT who spent the entire day with S.D., in compliance with the Settlement Agreement resulted in the untrained personnel calling school administrators to assist when S.D. was in a transition refusal (e.g., sitting on the carpet in art class and refusing to leave).

***Defendant's Failure to Comply with the Settlement Agreement Regarding the August 30, 2023, IEP Meeting***

68.     On August 30, 2023, S.D.'s IEP team met to conduct an addendum meeting, despite the Settlement Agreement requiring the meeting to be his annual review. Ex. 1, ¶ 7(a).

69.     As the IEP was not an annual review, it was set to expire in February 2024, rather than August 2024. Thus, the IEP team was required to meet in February 2024, which was the earliest time Defendant could unilaterally change S.D.'s placement and service delivery. Ex. 1 ¶ 8.

70.     The IEP team proposed S.D. be provided applied behavior analysis (ABA) therapy throughout the school day and on the bus ride home by Caitlin Shotts, an RBT Defendant presented as independent who was supervised by Jessica Harrison, a BCBA Defendant also presented as independent, both from ENC ABA.

71.     The Settlement Agreement provided for Defendant to develop a BIP at the August 30, 2023, IEP meeting based on the FBA conducted by Ms. Jennifer Holmes, BCBA, during the summer of 2023. Ex. 1 ¶¶ 6(a), 7(c). In violation of the Settlement Agreement, Defendant did not create a BIP at this meeting.

72.     During the August 30, 2023, IEP meeting, Ms. Shotts and Ms. Harrison agreed to adopt the FBA conducted by Ms. Holmes for their team to use and train the staff, to collect data, and to implement from the start of the school year. However, Ms. Harrison never trained the school staff regarding the FBA.

17

73. According to the Prior Written Notice (PWN) from the meeting, the IEP team did not discuss creating a new BIP based on the FBA, but "agreed to not adopt [the BIP created based on the 2022 FBA] at the current time due to the new FBA that was completed by Ms. Holmes. The team agreed that new data will be collect [sic] by the BCBA/RBT and to give him the time at his new school with new staff before we consider writing a BIP."

74. The Settlement Agreement provided the IEP team would "reconsider the related services in the December 2022 IEP to determine if they are sufficient, as well as consider the need for specially designed instruction in Adapted PE." Ex. 1, ¶ 7(e). According to the PWN, R.D. "expressed that she would like for the SLP to look at the data and determine if he needs more speech time than what is currently on the IEP. SLP will communicate with [R.D.] and the EC case manager to determine if an IEP meeting is needed for increased time."

75. Following the August 30, 2023, IEP meeting, there was no additional communication from the SLP regarding her review of data to determine if S.D. needed additional speech time.

76. The PWN does not reflect any discussion regarding a consideration of S.D.'s need for specially designed instruction in Adapted PE at this meeting, again in breach of the Settlement Agreement.

### *Plaintiffs' Compliance with the Settlement Agreement*

77. The Settlement Agreement required Plaintiffs to voluntarily dismiss the 2023 Due Process Petition with prejudice, which they did on August 29, 2023. It also

required Plaintiffs to release all past claims that could have been brought against Defendant pursuant to the IDEA and any other Federal or State disability law through August 28, 2023, even though the OAH did not have jurisdiction to hear such claims, and Plaintiffs had not filed any other claims. In compliance with the Settlement Agreement, Plaintiffs have not brought any other claims.

78. The Settlement Agreement required the Parties not to disparage each other regarding any of the released claims, to which Plaintiffs complied.

79. The Settlement Agreement included a confidentiality provision contrary to North Carolina State law that prohibited Plaintiffs from disclosing the terms of the settlement to which Plaintiffs complied. *See* N.C. Gen. Stat. § 132-1.3(a).

80. Plaintiffs would not have entered into the settlement agreement if the provisions related to the independent behavior support, inclusion consultant, and the specific provisions designed to support transparency in communication, independence of outside providers, and appropriate training and support for the school staff working with S.D. were not included in the Settlement Agreement.

***Retaliatory and Discriminatory Actions Taken Against Plaintiffs***

81. According to the April 2024 Child Count Defendant submitted to DPI, 1,077 students with disabilities are enrolled in the Defendant's district, each requiring at least one (1) Individualized Education Program (IEP) meeting each year. Upon information and belief, Dr. Boyd did not attend every IEP

meeting of these students; yet she purposefully attended S.D.'s meetings in the role of LEA Representative. She developed the agendas, led the meetings, and served as the final decisionmaker.

82. As Defendant did not conduct an annual review, as required by the Settlement Agreement, Defendant's staff attempted to schedule an IEP in January 2024, prior to the expiration of S.D.'s then-current IEP. Dr. Boyd ordered the meeting rescheduled until February 2024, as that was the earliest time Defendant could effectuate its plan to unilaterally change S.D.'s placement.

83. Dr. Boyd inserted herself as the LEA Representative to ensure she would have the authority to make the final decisions to change S.D.'s service delivery and the location of his service delivery in retaliation for Plaintiffs' prior advocacy and filing the 2023 Due Process Petition.

84. Dr. Boyd was the highest-ranking district official at S.D.'s IEP meetings. Her presence had a chilling effect on other staff members' participation and willingness to consider other options. Dr. Boyd led each discussion by stating her position first—changing S.D.'s curriculum to a non-diploma track and segregating him from his nondisabled peers—and then asked school personnel to state their positions knowing they would not contradict her edicts.

85. At the meetings, Dr. Boyd refused to consider evidence-based research related to inclusion and informed R.D., the Inclusion Consultant, and Jennifer Holmes, who has repeatedly been accepted as an expert in special education and behavior in multiple tribunals and courts, that she was not interested in

that research.

86. Instead, Dr. Boyd relied on her de minimis understanding of inclusion, which she proudly informed the IEP team she looked up in the dictionary.

87. When there was disagreement, Dr. Boyd would announce that she would make the decision as the LEA Representative.

88. As further evidence of Defendant's retaliatory intention to utilize the behavior data collected by the BCBA and RBT, which was subsequently reviewed and, upon information and belief, edited by Dr. Boyd prior to distribution to parents, Defendant also included in S.D.'s Individual Contract that the BCBA would "meet with the school district monthly to review progress toward the IEP and treatment plan goals and *discuss service delivery time/location options*." (emphasis added)

89. The service delivery time/location options are discussions for the IEP team, not for the BCBA to have with Dr. Boyd outside of an IEP meeting without the parent.

90. As further evidence of Defendant's retaliatory intent, while Defendant refused to comply with its obligations to the Settlement Agreement for the Inclusion Consultant based on the exhaustion of the agreed-upon funding Defendant did not limit the funding for the BCBA to the maximum amount in the Settlement Agreement. Thus, Defendant provided for the BCBA, who Defendant contracted to be a representative of CCPS, to gather data Defendant intended to use to segregate S.D., rather than provide support from the Inclusion

21

Consultant to support his inclusion with his nondisabled peers and access to the general education curriculum.

91. In the August 2024 IEP meeting, Dr. Boyd informed Plaintiff R.D. and her advocate that Defendant had concerns about S.D.'s behaviors and over the course of the year had "gathered data to support whatever programming we needed to support" the decision to remove S.D. from the standard course of study.

92. The Settlement Agreement provided for S.D.'s temporary removal for "significant disruptions" in the general education classroom. Defendant directed S.D.'s teacher to document any "significant disruptions" in her class, which she did in a shared Google doc with S.D.'s school administrators. According to the documentation provided, Defendant defined "significant disruption" to include S.D. receiving his specially designed instruction in the general education teacher's classroom from his special education teacher, passing gas, and utilizing his accommodations, which S.D.'s teacher included.

93. Defendant then identified the instances described above as "significant disruptions that required the intervention of school administration" misrepresenting to the IEP team the nature of the incidents.

94. At no point during the year, did S.D.'s transition refusals or other non-compliant behavior rise to the level of necessitating physical intervention; however, Defendant used the requirement of other adults to intervene--due to the absence of the agreed-upon training--to perpetuate Defendant's narrative

that S.D. needs to be segregated from his nondisabled peers.

95. The Settlement Agreement provided for S.D. to begin receiving compensatory services during the 2023-24 school year, and for the Transition Team to discuss adding an additional hour to his school day at least once per week to receive the services. The Transition Team never discussed compensatory services. S.D. did not receive <u>any</u> compensatory services during the summer of 2023 or through the date of this filing.

96. Dr. Boyd is responsible for contracting with an Exceptional Children teacher to provide these services, which she has not done. According to the Settlement Agreement, any services not provided at the end of the 2024-25 school year are forfeited.

97. Although Dr. Boyd never arranged for S.D. to receive compensatory services, she continually referenced his skill deficits—which the compensatory services were designed to address—as a basis for his segregation and changing his curriculum to a non-diploma track.

98. Shortly after S.D. started school in September 2023, when S.D. was out of the classroom with his RBT on a walk break as contemplated in his IEP, Ms. Danielle Canady, S.D.'s general education teacher, discriminatorily led S.D.'s non-disabled peers in creating a hand signal for the children, his third-grade classmates, to give her when felt they were "too distracted" by S.D.

99. Additionally, Ms. Canady created and circulated a Google Doc of "significant disruptions to classroom instruction," which included such "significant disruptions" as:

   o S.D.'s receiving instruction from his special education teacher/related service providers while Ms. Canady was providing whole-group instruction.

   o S.D. passed gas, and it smelled bad.

   o S.D.'s Augmentative and Alternative Communication (AAC) device malfunctioned and said "hamburger" repeatedly, and the other students laughed.

   o S.D. used his OT provided sensory materials during a sensory break in the classroom.

100. Although S.D.'s IEP included the accommodation for "modified assignments" with the following Implementation Specifications: "All assignments modified to accommodate [S.D.]'s current level of functioning, including physically to address fine motor skills. All assignments modified to address quality of work rather than quantity of work. Assignments modified to meet visual and hand-on learning style as necessary," Defendant gave S.D. all zeroes (0) in his academic courses "[d]ue to work being significantly modified well-below grade level, a numerical value cannot be assigned at this time."

101. Defendant then utilized these grades as a rationale for why it determined S.D., a rising fourth-grade student, could not attempt to receive a high school diploma.

102. Defendant refused to provide S.D. accommodations on assessments in accordance with his IEP, falsely informed Plaintiff R.D. he was not permitted to receive accommodations and utilized his scores as a basis for segregating S.D. and removing him from the standard course of study.

103. In the role of Defendant's LEA Representative, Dr. Boyd misrepresented to Plaintiff R.D. that if S.D. were removed from the standard course of study, he was required to receive instruction on core academics in a segregated setting.

104. Defendant retaliated against Plaintiffs by refusing to consider S.D.'s progress academically, behaviorally, and functionally throughout the school year and during ESY, as well as refusing to consider his new medical diagnosis of Type-1 Diabetes and the impact it had on his behaviors the prior year.

*2024 Due Process Petition (24-EDC-03399)*

105. On August 30, 2024, Plaintiffs filed a Petition for Contested Case Hearing in the OAH alleging violations of the IDEA, over which the OAH has jurisdiction including evaluation, placement, and FAPE.

106. Defendant provided a Response to the Petition on September 13, 2024.

107. Defendant provided a Response to Plaintiffs' Requests for Admissions on September 27, 2024, its Response to Plaintiff's Request for Production of

Documents and Interrogatories on after close of business on October 1, 2024, and its First Supplement Response after close of business on October 7, 2024.

108. On October 4, 2024, Defendant filed a Motion for Partial Dismissal or, in the Alternative, Motion for Partial Summary Judgment Rule 12(b)(1), 12(b)(6), 12(h)(3), and Rule 56.

109. Although Plaintiffs did not raise any released claims and identified the contested time period as starting after the Settlement Agreement, Defendant's Motion posited the OAH had jurisdiction to enforce the Settlement Agreement against Plaintiffs and attached a copy of the Settlement Agreement to its Motion.

110. Plaintiffs alone were bound to confidentiality regarding the contents of the Settlement Agreement. Ex. 1. ¶16. When Defendant disclosed the terms of the Settlement Agreement to the Tribunal, Plaintiffs were free to raise issues of Defendant's non-compliance as evidenced in Defendant's discovery responses provided to Plaintiffs and Defendant's pleadings and filings on the OAH docket.

111. On October 7, 2024, Plaintiffs notified Defendant of its breach of the Settlement Agreement and requested mediation through DPI on October 8, 2024, as contemplated in the Settlement Agreement.

112. On October 10, 2024, Plaintiffs filed a Motion for Leave to Amend the prior due process petition to "clarify the factual allegations based on additional information provided by [Defendant] in discovery and its pleadings and filings

in this case, include additional allegations related to the [Defendant]'s failure to comply with the agreed-upon terms of the Settlement Agreement, and [Defendant]'s ongoing failure to comply with the Individuals with Disabilities Education Improvement Act ("IDEA").

113. On October 14, 2024, Defendant objected to Plaintiffs' Motion for Leave to Amend on multiple grounds. As it relates to Plaintiffs' additional claims regarding Defendant's breach of the Settlement Agreement, Defendant specifically argued "[t]his Tribunal has no jurisdiction over alleged breaches of settlement agreements, and any alleged breach is required to be mediated by the Parties (which has not yet occurred) so such claims are therefore not ripe."

114. On October 14, 2024, the Honorable Administrative Law Judge Samuel K. Morris ("ALJ Morris") granted Plaintiffs' Motion for Leave to Amend.

115. On October 14, 2024, DPI assigned a mediator who contacted the Parties to arrange a mutually agreeable date to hold the mediation.

116. Plaintiffs filed their Amended Due Process Petition on October 21, 2024, which included information regarding Plaintiffs' efforts to resolve the matter without litigation. At the time of the filing of the Amended Due Process Petition, Defendant had not responded to the DPI mediator regarding its availability to participate in mediation.

117. Plaintiffs noted "[i]f the Parties are unable to resolve these disputes regarding the Settlement Agreement through informal negotiations or mediation," in accordance with North Carolina General Statute Section 115C-109.4(h)(4), the

Settlement Agreement is enforceable by "[the OAH], any State court of competent jurisdiction, or in a district court of the United States."

118. On October 23, 2024, the Parties agreed to participate in virtual mediation, which was held on November 6, 2024, and November 14, 2024. Defendant declared an impasse.

119. On October 30, 2024, the Plaintiffs agreed to participate in what they understood to be a resolution meeting as contemplated and required by the IDEA. However, in retaliation, Defendant deemed the meeting an IEP meeting, during which Dr. Boyd informed Plaintiffs the IEP team did not have the authority to resolve the due process complaint and refused to discuss the basis of the complaint.

120. As Defendant had raised the question of OAH's jurisdiction previously, Plaintiffs filed a Motion for Declaratory Judgment on the issue of jurisdiction, as Defendant's misrepresentations regarding its intent to comply and failure to comply with the terms of the Settlement Agreement is a threshold issue to determining the scope of the claims and the issues before the OAH. ALJ Morris promptly denied the Motion explaining the OAH does not have authority to issue declaratory rulings.

121. Plaintiffs then filed a Motion to Bifurcate the hearing to determine the issues related to the Settlement Agreement first. Immediately prior to the Prehearing Conference with ALJ Morris, Defendant filed a Motion to Dismiss claims related to the Settlement Agreement due to a lack of jurisdiction, to which Plaintiffs timely replied.

122. On November 28, 2024, at the start of the hearing, ALJ Morris heard arguments on the Motion to Dismiss.

123. ALJ Morris granted Defendant's Motion to Dismiss and dismissed two (2) of Plaintiffs claims:

    a. Whether Respondent implemented the agreed-upon terms of the August 28, 2023, Settlement Agreement;

    b. Whether Respondent misrepresented to Petitioners its intent to comply with the August 28, 2023, Settlement Agreement.

124. Plaintiffs then orally moved to continue the due process hearing to challenge the ruling and have the claims related to the settlement agreement heard in this forum.

## CLAIMS FOR RELIEF

### COUNT I:

### Declaratory Judgment of OAH Jurisdiction

125. Plaintiffs incorporate by reference each of the allegation of this Complaint as if fully set forth herein.

126. The IDEA allows each State to establish procedures related to disputes between parents and LEAs. 20 U.S.C. § 1415(a). North Carolina utilizes administrative law judges (ALJs) from the Office of Administrative Hearings (OAH) "with respect to **_any matter_** relating to the identification, evaluation, or educational placement of a child, or the provision of a free appropriate public education of a child, or a manifestation determination." N.C. Gen. Stat. § 115C-109.6(a) (emphasis added).

127. The IDEA requires State Educational Agencies (SEAs) and LEAs to "ensure that procedures are established and implemented to allow parties to disputes involving any matter, including matters arising prior to the filing of a due process complaint . . . to resolve disputes through a mediation process." 20 U.S.C. § 1415(e)(1); 34 C.F.R. § 300.506(a).

128. States have discretion to broaden the parameters of the mediation process, as long as the foundational requirements in the IDEA are satisfied. *See, e.g.*, 71 Fed. Reg. 46695 (deferring to the State as to whether to formal training or certification is necessary for mediators paid for by the SEA); 71 Fed. Reg. 46695 (deferring to the State as to whether to provide the list of mediators and their qualifications who are assigned randomly by the SEA).

129. The IDEA differentiates between the responsibilities of "the State" and those of the SEA. *Compare* 20 U.S.C. § 1401(32) (defining the SEA as "the State board of education or other agency or officer primarily responsible for the State supervision of public elementary schools and secondary schools . . .") *and* - § 1401(31) (defining State as "each of the 50 States, the District of Columbia, the Commonwealth of Puerto Rico, and each of the outlying areas"). This is equally true as it relates to mediation. *Compare, e.g.*, 20 U.S.C. § 1415(e)(1) (requiring the SEA to establish procedures for mediation) *with* § 1415(e)(2)(D) (requiring the State to bear the cost of the mediation process).

130. The IDEA does not define "mediation." 20 U.S.C. § 1401 (Definitions). As it relates to the Education of Children with Disabilities, North Carolina defines

"mediation" as "[a]n informal process conducted by a mediator with the objective of helping parties voluntarily settle their dispute." N.C. Gen. Stat. § 115C-106.3(12).

131. One of the purposes of the IDEA requires States to give parents and schools "expanded opportunities to resolve their disagreements in positive and constructive ways." 20 U.S.C. § 1400(c)(8). Any State rule, regulations, and policies must conform to the purposes of the IDEA. 20 U.S.C. § 1407(a)(1).

132. North Carolina chose to expand the mediation venues available to parents and schools in addition to those required by the IDEA to encourage LEAs and parents "to seek mediation involving any dispute under this Article." N.C. Gen. Stat. § 115C-109.4(a); - § 115C-109.4(i) (allowing parties to "participate in a mediated settlement conference as provided for by G.S. 150B-23.1" as another form of mediation).

133. Unlike mediated settlement conferences ordered by the chief administrative law judge, which are conducted by an outside mediator and paid for by the parties under Section 150B-23.1, ALJ mediated settlement conferences to resolve IDEA disputes are voluntary as required by the IDEA and State law, and conducted by an ALJ who is employed by the State. *Compare* N.C. Gen. Stat. § 150B-23.1(a),(e),(i) *with* § 115C-109.4(i) (offering parties ALJ mediated settlement conferences as another option for mediation), -106.3(12) (defining mediation as voluntary), Memorandum of Understanding between the SEA and OAH ("MOU"), Section V(D)(5) (agreeing an ALJ may be appointed to

conduct mediations in IDEA disputes after parties have participated in a mediation with a North Carolina Department of Public Instruction ("DPI") mediator).

134. Through the Memorandum of Understanding, the State has agreed to bear these costs by appointing an ALJ to conduct the mediated settlement conference without requiring a payment from the SEA for "any costs associated with the parties' use of settlement conferences." MOU, Section V(D)(5).

135. North Carolina also chose to expand the jurisdiction of adjudicatory entities authorized to enforce written agreements reached through mediation to resolve IDEA disputes to include "any State administrative forum provided for in IDEA" in addition to "any State court of competent jurisdiction, or in a district court of the United States." N.C. Gen. Stat. § 115C-109.4(h)(4)

136. On November 25, 2024, ALJ Morris entered an Order dismissing without prejudice two of Plaintiff's claims in the pending 2024 due process action: (1) Whether Respondent implemented the agreed-upon terms of the August 28, 2023 Settlement Agreement; and (2) Whether Respondent misrepresented to Petitioners its intent to comply with the August 28, 2023, Settlement Agreement; because "[OAH] is not a court of competent jurisdiction to hear a breach of settlement claim, regardless of the merits of such a claim. That jurisdiction lies with either a state court of competent jurisdiction or the federal district court. As such, the Undersigned has no discretion but to dismiss

Petitioner's breach of settlement claims."

137.   The issues related to the Settlement Agreement are threshold issues that must be resolved prior to the adjudication of the remaining FAPE claims, as the implications of the breach and the misrepresentations to Plaintiffs are inextricably intertwined in the determination of Defendant's FAPE violations and the scope of Plaintiffs' claims.

138.   An actual controversy has arisen and now exists between the parties concerning whether the OAH has jurisdiction to hear claims related to Defendant's breach of the Settlement Agreement.

139.   Judicial declarations are necessary and appropriate at this time to enable the parties to ascertain their rights and duties to each other.

140.   Plaintiff seeks a judicial determination the OAH has jurisdiction to hear claims related to the breach of an IDEA settlement agreement entered into through an ALJ mediated settlement conference.

## COUNT II

**Enforcement of IDEA Settlement Agreement/Breach of Contract
20 U.S.C. § 1415**

141.   Plaintiffs incorporate by reference the allegations of the preceding paragraphs as though fully set forth herein.

142.   Settlement agreements reached through mediation to resolve due process complaints are "enforceable in any State court of competent jurisdiction or in a district court of the United States." 20 U.S.C. § 1415(e)(2)(F)(iii).

143.   Breach of a Settlement Agreement is another iteration of a claim for breach of

contract, which, requires the "(1) existence of a valid contract and (2) breach of that contract." contract. *Poor v. Hill*, 138 N.C. App. 19, 26 (2000) (^ *Jackson v. California Hardwood Co.*, 120 N.C.App. 870, 871 (1995)).

144. A mediated settlement agreement constitutes a valid contract between the settling parties "governed by general principles of contract law." *Chappell v. Roth,* 353 N.C. 690, 692 (2001) (citing *McNair v. Goodwin,* 262 N.C. 1, 7, 136 S.E.2d 218, 223 (1964)). "If the contract is clearly expressed, it must be enforced as it is written, and the court may not disregard the plainly expressed meaning of its language." *Catawba Athletics v. Newton Car Wash,* 53 N.C.App. 708, 712, 281 S.E.2d 676, 679 (1981).

145. Whether a breach is material or immaterial is ordinarily a question of fact. *Millis Construction Co. v. Fairfield Sapphire Valley,* 86 N.C.App. 506, 512, 358 S.E.2d 566, 570 (1987). A material breach is "one that substantially defeats the purpose of the agreement or goes to the very heart of the agreement, or can be characterized as a substantial failure to perform." *Supplee v. Miller-Motte Bus. Coll., Inc.*, 239 N.C.App. 208, 768 S.E.2d 582, 593 (2015).

146. "As a general rule, if either party to a bilateral contract commits a material breach of the contract, the non-breaching party is excused from the obligation to perform further." *McClure Lumber Co. v. Helmsman Constr., Inc.*, 160 N.C.App. 190 (2003).

147. A term may be deemed material if one party would not have entered into the

agreement without it. *See id.* at 198 (2003) (finding Plaintiff materially breached the settlement agreement by not releasing a letter of credit when Defendants would not have agreed to the settlement if Plaintiff had not promised to release the letter of credit).

148. "The party claiming the right to specific performance must show *the existence of a valid contract*, its terms, and either *full performance on his part* or that he is ready, willing and able to perform." *Munchak Corp. v. Caldwell*, 301 N.C. 689, 694, 273 S.E.2d 281, 285 (1981) (emphasis supplied and citation omitted).

149. As set forth above, the Parties have a valid contract (the Settlement Agreement), Defendant breached material terms of the Settlement Agreement, and Plaintiffs have performed all conditions, covenants, and promises they were required to perform in accordance with the terms of the Settlement Agreement.

150. As a direct and proximate result of Defendants' breach, S.D. continues to suffer educational harm and impairment, and Plaintiffs continue to sustain monetary damages.

## COUNT III

**Breach of Implied Covenant of Good Faith and Fair Dealing**

151. Under North Carolina law, every contract contains "an implied covenant of good faith and fair dealing that neither party will do anything which injures the right of the other to receive the benefits of the agreement." *Bicycle Transit Auth. v. Bell*, 314 N.C. 219, 228, 333 S.E.2d 299, 305 (1985) (citation and

quotation marks omitted); *see also Maglione v. Aegis Family Health Ctrs.*, 168 N.C. App. 49, 56, 607 S.E.2d 286, 291 (2005) ("In addition to its express terms, a contract contains all terms that are necessarily implied to effect the intention of the parties and which are not in conflict with the express terms.") (citation and quotation marks omitted).

152. Among these implied terms is the "basic principle of contract law that a party who enters into an enforceable contract is required to act in good faith and to make reasonable efforts to perform his obligations under the agreement." *Weyerhaeuser Co. v. Godwin Building Supply Co.*, 40 N.C.App. 743, 746, 253 S.E.2d 625, 627 (1979) (citations omitted)." All parties to a contract must act upon principles of good faith and fair dealing to accomplish the purpose of an agreement, and therefore each has a duty to adhere to the presuppositions of the contract for meeting this purpose." Maglione 168 N.C. App. at 56 (2005) citing Weyerhauser Co. 40 N.C. App. At 746 (1979).

153. The Settlement Agreement contains a covenant implied by law that Defendant will act towards Plaintiffs in good faith and with fair dealing.

154. The implied covenant of good faith and fair dealing imposes upon Defendant the duty not to take any actions with the motive to intentionally frustrate the Plaintiffs' enjoyment of their rights and benefits under the Agreement.

155. In committing the acts alleged herein, Defendant has breached the implied covenant of good faith and fair dealing in the Settlement Agreement.

156. By perpetrating the above-described acts and omissions, Defendant acted in

bad faith and with a motive intentionally to frustrate the Plaintiffs' enjoyment of their rights and benefits under the Settlement Agreement.

157. As a direct and proximate result of Defendants' breach, S.D. continues to suffer educational harm and impairment, and Plaintiffs continue to sustain monetary damages.

## COUNT IV

**Retaliation in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq.* and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq.***

158. Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

159. Section 504 and the ADA, both prohibit retaliation against students with disabilities. The anti-retaliation provisions of both laws are essentially identical and therefore are analyzed together; "retaliation claims under § 504 are subject to the same standard as ADA retaliation claims." *S.B. ex rel. A.L. v. Board of Educ. of Harford Cnty.*, 819 F.3d 69, 78 n.6 (4th Cir. 2016). Section 504 incorporates the anti-retaliation language of Title VI of the Civil Rights Act of 1964, which "prohibits recipients from intimidating, threatening, coercing, or discriminating against any individual for the purpose of interfering with any right or privilege . . . or because he has made a complaint, testified, assisted, or participated in any manner in an investigation, proceeding or hearing under this part." 34 C.F.R. §104.61 and 34 C.F.R. §100.7(e).

160. No public or private entity may discriminate against individuals for engaging

37

in protected activities, such as opposing discriminatory practices or participating in investigations or proceedings under the ADA. 28 CFR § 36.206; *see also Reynolds v. American Nat. Red Cross*, 701 F.3d 143, 154 (4th Cir. 2012). Additionally, the regulations implementing Section 504 make it unlawful to "[i]ntimidate or retaliate against any individual ... for the purpose of interfering with any right secured by [the Rehabilitation Act]." 28 C.F.R. § 42.503(b)(1)(vii).

161. The purpose of these statutes is to protect the students and their advocates in collaborating and supervising the child's education program to explicitly "balance the natural advantage of districts." *Schaffer v. Weast*, 546 U.S. 49 (2005).

162. To state a prima facie retaliation claim a plaintiff must allege that "(1) he engaged in protected conduct, (2) he suffered an adverse action, and (3) a causal link exists between the protected conduct and the adverse action." See *Manning v. N. Carolina State Univ.*, 724 F.Supp.3d 438, 461 (E.D.N.C. 2024).

163. As outlined *supra*, Defendant Board retaliated against S.D. and his parents for exercising their legal right to advocate on his behalf by filing an IDEA due process petition.

164. As a direct and proximate result of Defendants' retaliation based on S.D.'s disability, S.D. continues to suffer educational harm and impairment and Plaintiffs continue to sustain monetary damages.

# COUNT V

**Discrimination Based on Disability in Violation of Section 504 of the Rehabilitation Act, 29 U.S.C. § 794 *et seq*. and the Americans with Disabilities Act, 42 U.S.C. § 12101 *et seq*.**

165.  Plaintiffs incorporate all preceding paragraphs into this Count by reference as if fully stated herein.

166.  Plaintiff S.D. is a "handicapped person" as defined by the regulations of Section 504 of the Rehabilitation Act ("Section 504") and is otherwise qualified to attend school in Defendant Board's school district and access the general education program with non-disabled peers. 34 C.F.R. § 104.3(j)(1).

167.  Likewise, S.D. is a "qualified individual with a disability," as defined by the Americans with Disabilities Act, 42 U.S.C. § 12131(2).

168.  Defendant is a public entity subject to Title II of the ADA, 42 U.S.C. § 12131.

169.  Section 504 applies to each recipient of federal financial assistance from the Department of Education and to the program or activity that receives such assistance. 29 U.S.C. § 794(b)(2)(B); 34 C.F.R. § 104.2. Defendant Board is a "recipient of Federal financial assistance from the Department of Education" that operates a program or activity as defined by the regulations of Section 504. 34 C.F.R. § 104.38; 34 C.F.R. 104.34.

170.  Title II of the ADA and its regulations provide that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132; *see also* 28 C.F.R. Part 35).

171. Section 504 prohibits public entities, including local educational agencies (LEAs), from "exclud[ing] from the participation in, [ ] den[ying] the benefits of, or [ ] subject[ing] to discrimination" any otherwise qualified person with a disability from any program or activity receiving federal financial assistance solely by reason of her or his disability. 29 U.S.C. § 794(a).

172. Section 504 requires LEAs to utilize "tests and other evaluation materials have been validated for the specific purpose for which they are used and are administered by trained personnel in conformance with the instructions provided by their producer." 34 C.F.R. § 104.35(b)(1).

173. Section 504 further prohibits LEAs from "provid[ing] a qualified handicapped person with an aid, benefit, or service that is not as effective as that provided to others." 34 C.F.R. § 104.4(b)(1)(iii).

174. Title II of the ADA and Section 504 are closely related, and "there is no significant difference in the analysis of rights and obligations created by the two Acts." *K.M. v. Tustin Unified Sch. Dist.*, 725 F.3d 1088 (9th Cir. 2013) (quoting *Vinson v. Thomas*, 288 F.3d 1145, 1152 n.7 (9th Cir. 2002)); *Seremeth v. Bd. of Cnty. Comm'rs Frederick Cnty.*, 673 F.3d 333, 336 n.1 (4th Cir. 2012).

175. To establish discrimination in the context of education of handicapped children, plaintiffs must show the defendant acted in "either bad faith or gross misjudgment." *K.D. ex rel. J.D. v. Starr*, 55 F.Supp.3d 782, 790 (D. Md. 2017) (citing *Sellers by Sellers v. Sch. Bd. of the City of Manassas, Virginia*, 141 F.3d 524, 529 (4th Cir. 1998)).

176. Under the ADA and Section 504, Defendant Board is vicariously liable for the actions of its subordinates. *Rosen v. Montgomery Cnty. Maryland*, 121 F.3d 154, 157, n.3 (4th Cir. 1997).

177. Defendant intentionally violated S.D.'s rights under Section 504 and Title II of the ADA by intentionally excluding him from participation in and denying him the benefits of Defendant's services, programs, activities, on the basis of disability, and subjecting him to discrimination.

178. Defendant intentionally discriminated against S.D. in violation of Section 504 and Title II of the ADA.

179. Defendant acted with deliberate indifference toward S.D.'s rights protected by Title II of the ADA.

180. As a direct and proximate result of Defendants' discrimination based on S.D.'s disability, S.D. continues to suffer educational harm and impairment, and Plaintiffs continue to sustain monetary damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request the following relief:

1. Find Defendants violated federal and state law;

2. Find that Plaintiffs are the prevailing party;

3. Enter a declaratory judgment that the OAH has jurisdiction to hear claims related to the breach of an IDEA settlement agreement entered into through an ALJ mediated settlement conference provided for under State law as part of mediation of an IDEA dispute;

4. Award Plaintiffs equitable and injunctive relief;

5. Order Defendant's specific performance under the contract;

6. Award Plaintiffs compensatory damages;

7. Award Plaintiffs their reasonable attorneys' fees and costs; and

8. Any other and further relief deemed necessary.

Respectfully submitted, this the __2nd__ day of December 2024.

/s/ Stacey M. Gahagan
Stacey M. Gahagan
N.C. State Bar No. 44393
Email: sgahagan@ncgplaw.com
/s/ Nataleigh N. Knaak
Nataleigh N. Knaak
N.C. State Bar No. 61973
Email: nknaak@ncgplaw.com
237 W. Pennsylvania Avenue
Southern Pines, NC 28387
Telephone: (919) 942-1430